**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

CRAIG THOMPSON,

                              Petitioner,

       v.                                                9:23-CV-0863
                                                     (BKS/DJS)

SUPERINTENDENT,

                            Respondent.

---

**APPEARANCES:**                                           **OF COUNSEL:**

LAW OFFICE OF DANIELLE NERONI
Counsel for Petitioner
668 Madison Avenue
Albany, New York 12208

HON. LETITIA JAMES                                   JALINA J. HUDSON, ESQ.
Attorney for Respondents                           Assistant Attorney General
New York State Attorney General
28 Liberty Street
New York, New York 10005

**DANIEL J. STEWART**
**United States Magistrate Judge**

<u>**REPORT-RECOMMENDATION and ORDER**</u>

**I. INTRODUCTION**

      Petitioner Craig Thompson filed a counseled pleading seeking federal habeas relief pursuant

to 28 U.S.C. § 2254.  Dkt. No. 1, Petition ("Pet."); Dkt. No. 1-2 at 1-4, Memorandum of Law in

Support; Dkt. No. 1-2 at 5-14 & Dkt. No. 1-3, Exhibits.[1]  The Court directed Respondent to answer

---

[1] For the sake of clarity, citations to parties' filings refer to the pagination generated by CM/ECF, the Court's electronic filing system.  The only exception is the State Court Record ("SCR").  Dkt. Nos. 6-1–6-3.  Instead, citations to the SCR will reference the Bates-Stamped number in the center of the bottom of each page because those three
                                                          (continued...)

the Petition. Dkt. No. 2, Decision and Order ("July Order").

Respondent filed a limited answer addressing the issue of timeliness. Dkt. No. 6, Motion (requesting permission to (1) limit the initial answer to the issue of timeliness and (2) have the Court accept the filing as the limited answer); Dkt. No. 6-1–6-3, State Court Records ("SCR"); Dkt. No. 7, Text Order (granting the motion).

For the reasons which follow, it is recommended that the Petition should be denied and dismissed in its entirety.

## II. BACKGROUND

As outlined in the New York State Appellate Division, Third Department's decision, the relevant facts are as follows:

> [Petitioner] was indicted for various crimes relating to the shooting death of Hassan Rainey. [Petitioner] and his friends, Kassun Brown and Keith Dunbar, as well as Rainey, were all involved with selling drugs and had a dispute over money and drug sales during late August and early September 2007. On September 12, 2007, Dunbar was shot in the shoulder during an incident in which Rainey was involved. The next day, after Dunbar was discharged from the hospital, [petitioner] was driving around in his minivan with Brown and Dunbar and came upon Rainey in his car at a red light. At [petitioner]'s urging, Brown pulled up alongside Rainey's vehicle in such a way that the passenger-side door of the minivan was lined up with Rainey's driver-side door. [Petitioner] and Brown then shot at Rainey's vehicle and fled. It was subsequently determined that a .40 caliber bullet caused Rainey's death.

*People v. Thompson*, 75 A.D.3d 760, 761 (3rd Dep't 2010).

Further trial testimony from both Brown and Dunbar indicated that Petitioner "possessed the loaded .40 caliber gun that killed Rainey and that [petitioner] fired the fatal shot. Dunbar also

---

[1](...continued)
separate attachments actually comprise one complete and consecutively paginated document.

testified that, after they left the scene, [Petitioner] stated, 'I think I hit him' and two other witnesses testified that [Petitioner] admitted to them that he killed Rainey." *Id.* at 763. Another witness, Adrian Scott, "testified that he saw a .40 caliber gun at Dunbar's apartment," and that, after the shooting, Petitioner "admitted that he 'got rid of it, broke it down.'" *Id.* at 763-64. Finally, ".40 caliber bullets and casings [were recovered] in connection," with the investigation following the shooting. *Id.* at 764.

> Following a jury trial, [Petitioner] was convicted of murder in the second degree, criminal possession of a weapon in the second degree, reckless endangerment in the first degree, tampering with physical evidence (two counts) and criminal possession of a weapon in the fourth degree. [Petitioner] was thereafter sentenced to an aggregate prison term of 27 2/3 years to life.

*Id.* at 761-62.

### III. THE PETITION

Petitioner challenges the aforementioned 2008 jury verdict and judgment of conviction in Schenectady County Court. Pet. at 1-2; *see also People v. Thompson*, 75 A.D.3d at 761.[2] Petitioner directly appealed his conviction and the Third Department modified Petitioner's judgment on the law, reversed his convictions for reckless endangerment and criminal possession of a weapon, vacated those two corresponding sentences, and affirmed the rest of the conviction and sentence. Pet. at 1-2; *People v. Thompson*, 75 A.D.3d at 766. On October 21, 2010, the New York State Court of Appeals denied Petitioner's application for leave to appeal. *People v. Thompson*, 15 N.Y.3d 896 (2010).

Petitioner also unsuccessfully attempted to collaterally challenge his conviction by filing four

---

[2] A copy of the New York State Appellate Division, Third Department's decision is included in the supporting exhibits. Dkt. No. 1-3 at 199-202.

motions to vacate it, pursuant to New York State Criminal Procedure Law § 440.10 ("440 motion").

Pet. at 3-4; SCR at 137-155 (first counseled 440 motion filed September 28, 2016); SCR at 156-162

(Schenectady County Court decision, dated May 24, 2007, denying first 440 motion); SCR at 163-

178 (second pro se 440 motion dated June 4, 2018); SCR at 196-98 (Schenectady County Court

decision, dated October 31, 2018, denying second 440 motion); SCR at 200-211 (third pro se 440

motion filed December 30, 2019); SCR at 414-16 (Schenectady County Court decision, dated

February 2, 2021, denying third 440 motion); SCR at 417-441 (fourth pro se 440 motion dated

August 4, 2020); SCR at 653-55 (Schenectady County Court decision, dated March 11, 2021,

denying fourth 440 motion).[3]

Petitioner then allegedly came in to possession of new evidence. SCR at 659-666.

Specifically, on November 10, 2021, Petitioner received a sworn statement from Dunbar - one of the

key prosecution witnesses - with information which purportedly rendered Petitioner's state criminal

trial unconstitutional. SCR at 662; *See also* SCR at 668 (Dunbar statement). Consequently, a fifth

counseled 440 motion - dated April 4, 2022, and received by the Schenectady County Court on April

6, 2022 - argued Petitioner was entitled to relief because (1) his trial was rendered unfair by the

*Brady* violation evidence in Dunbar's statement and (2) his conviction was based on

misrepresentations and fraud as the consequence of prosecutorial misconduct. SCR at 659-666. The

440 motion was denied by Schenectady County Court on June 2, 2022, SCR at 742-750, and the

application for leave to appeal was denied by the Third Department on August 10, 2022, SCR at

---

[3] Copies of decisions denying the second and third 440 motions were included as attachments to the Petition.
*See* Dkt. No. 1-3 at 165 (Schenectady County Court decision dated October 31, 2018) & Dkt. No. 1-3 at 167-69
(Schenectady County Court decision dated February 3, 2021).

751.[4]

Petitioner repeats the arguments from his fifth 440 motion, claiming that he is entitled to federal habeas relief because (1) the *Brady* violation, specifically failing to disclose all the details surrounding Dunbar's potential criminal exposure and benefits derived from his cooperation, deprived petitioner of a constitutionally fair trial and (2) the prosecutorial misconduct, in failing to produce the aforementioned *Brady* material, resulted in the jury being misled and convicting petitioner on misinformation. Pet. at 5-8.

## IV. DISCUSSION

### A. Second/Successive Habeas Petition

Respondent first argues that the instant petition is successive and, as such, permission from the Second Circuit was first required before the undersigned could evaluate its merits. Dkt. No. 6 at 1. While the counseled Petition indicated that Petitioner previously filed something in the Northern District of New York, Pet. at 12, the details of the filing were not included. Upon review, the undersigned agrees that this is a second petition, which would require permission from the Second Circuit before filing; however, dismissal of the action, instead of transferring it, is the most efficient use of judicial resources.

The Antiterrorism and Effective Death Penalty Act (AEDPA) restricted the ability of petitioners to file second or successive petitions. *Torres v. Senkowski*, 316 F.3d 147, 150 (2d Cir. 2003). A petition is a second or successive application when it "attacks the same judgment that was attacked in a prior petition," *Vasquez v. Parrott*, 318 F.3d 387, 390 (2d Cir. 2003) (internal quotation

---

[4] Copies of the Schenectady County Court and Third Department decisions, as well as the counseled application for leave to appeal, were also attached to the Petition. *See* Dkt. No. 1-3 at 173-181 (Schenectady County Court decision); Dkt. No. 1-3 at 182-197 (application for leave to appeal); Dkt. No. 1-3 at 198 (Third Department decision).

marks omitted), the prior petition was dismissed on the merits, *Murray v. Greiner*, 394 F.3d 78, 81 (2d Cir. 2005), and the later petition "raises a claim that was, or could have been, raised in [the] earlier petition." *James v. Walsh*, 308 F.3d 162, 167 (2d Cir. 2002); *accord, Adams v. Corcoran*, 416 F. App'x 84, 85 (2d Cir. 2011) ("While not every numerically second petition is considered a second or successive one, a dismissal on the merits . . . renders any subsequent petition second or successive within the meaning of AEDPA.") (internal quotation marks omitted).

In such circumstances, the AEDPA requires individuals seeking to file a second or successive petition to obtain leave of the appropriate Court of Appeals for an order authorizing the district court to consider the second or successive application. 28 U.S.C. § 2244(b)(1)-(3); *see also* Rule 9 of the Rules Governing Section 2254 Cases in the United States District Courts ("Before presenting a second or successive petition, the petitioner must obtain an order from the appropriate court of appeals authorizing the district court to consider the petition as required by 28 U.S.C. § 2244(b)(3) and (4)."); N.D.N.Y. L.R. 72.4(c) ("Before a second or successive application is filed in this Court, the applicant shall move in the Second Circuit Court of Appeals for an order authorizing the district court to consider the application."). The Second Circuit has directed "that when a second or successive petition for habeas corpus relief . . . is filed in a district court without the authorization by th[e Second Circuit] that is mandated by § 2244(b)(3), the district court should transfer the petition or motion to th[e Second Circuit] in the interest of justice pursuant to § 1631[.]" *Liriano v. United States*, 95 F.3d 119, 123 (2d Cir. 1996).

Here, petitioner previously filed a pro se federal habeas action in this district. *See Thompson v. LaValley*, No. 9:11-CV-1179 (GTS) ("*Thompson I*"), Dkt. No. 1, Petition. The petition attacked Petitioner's "judgment of conviction entered in Schenectady County Court, following a jury trial,

for second-degree murder, criminal possession of a weapon, and several related charges." *Thompson I*, Dkt. No. 10, Decision and Order ("June Order"), at 1-2 (citing *Thompson I*, Petition, at 1-2). The "criminal charges stem[ned] from [Petitioner's] involvement in the shooting death of Hassan Rainey . . . [o]n September 13, 2007 . . . [when] Petitioner and Kassun Brown . . . opened fire on an adjacent vehicle driven by Rainey." *Thompson I*, June Order at 2 (citing *People v. Thompson*, 75 A.D.3d 760, 761 (3rd Dep't 2010). Accordingly, Petitioner's prior habeas petition challenged the same conviction he is currently challenging in the instant action.

Further, this Court denied the claims presented in *Thompson I* on the merits. *See Thompson I*, June Order at 8-21 (discussing, and ultimately denying, the merits of petitioner's claims regarding the weight of the evidence, trial court errors during the jury charge, and the legal sufficiency of the evidence). For the reasons outlined below, the information contained in Dunbar's statement is not new. Accordingly, it should have been known by Petitioner at the time of his criminal trial and direct appeal, which was years before he filed *Thompson I*. Thus, this is a second or successive petition.

The Second Circuit has directed subsequent petitions be transferred, instead of dismissed, to "aid litigants who were confused about the proper forum for review." *Liriano v. United States*, 95 F.3d 119, 122 (2d Cir. 1996). "In determining whether a transfer is in the interests of justice . . . [f]actors militating for a transfer include a finding that a new action filed by the litigant would be barred as untimely . . . and a finding that the original action was filed in good faith." *Id.* (internal quotation marks and citations omitted). The Second Circuit specifically defined an instance of good faith, where the inmate's successive "filing . . . reflect[ed] ignorance concerning the . . . procedural requirements of § 2244(b)(3), rather than an effort to circumvent those requirements." *Id.*

-7-

Here, the undersigned has been mindful that "the equities of dismissing [this] claim [instead of] . . . transferr[ing it have] be[en] carefully weighed." *Lirano v. United States*, 95 F.3d at 120. First, the instant action is already untimely, and transferring the case, instead of dismissing it, will not change that. Further, unlike many prisoners who must pursue federal habeas relief pro se, Petitioner had the benefit of counsel when filing the instant action. Therefore, the leniency the Second Circuit instructed federal courts to provide pro se litigants, for their ignorance surrounding the various procedural requirements applicable to federal habeas actions, is not necessary here.

In sum, dismissal of the petition, instead of transfer, is the better option because it represents the most efficient use of judicial resources and the parties' time.

### B. Timeliness

Dismissal is appropriate in any event because the Petition is untimely.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), enacted on April 24, 1996, established a one-year statute of limitations for prisoners to seek federal review of their state court criminal convictions. 28 U.S.C. § 2244(d)(1). The one-year period generally begins to run from the date on which the state criminal conviction became final by the conclusion of direct review or by the expiration of the time to seek direct review. 28 U.S.C. § 2244(d)(1)(A); *Gonzalez v. Thaler*, 565 U.S. 134, 149-50 & n.9 (2012). However, other dates from which the limitations period may start running are (1) the date on which an unconstitutional, state-created impediment to filing a habeas petition is removed; (2) the date on which the constitutional right on which the petitioner bases his habeas application was initially recognized by the Supreme Court, if the right was newly recognized and made retroactively applicable; or (3) the date on which the factual predicate for the claim or claims presented could have been discovered through the exercise of due

diligence (newly discovered evidence). *See* 28 U.S.C. § 2244(d)(1)(B)-(D).

While not explicitly stated by his counsel, it appears Petitioner seeks to have an alternate accrual date for the statutory limitations period based on when he received the *Brady* material, on November 10, 2021. *See* Pet. at 13-14 (failing to provide any explanation about why the Petition is timely filed).[5] Per 28 U.S.C. § 2244(d)(1)(D), Petitioner would have had one year after becoming aware of new evidence - in this case until November 10, 2022 - to timely file the instant action. The Petition, dated on July 13, 2023, and electronically filed on July 19, 2023, appears to be commenced at least eight months beyond the expiration of the statutory limitations period.

### i. Statutory Tolling

However, the one-year limitation period under AEDPA is tolled while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2); *Saunders v. Senkowski*, 587 F.3d 543, 548 (2d. Cir. 2009). The tolling provision "excludes time during which properly filed state relief applications are pending, but does not reset the date from which the one-year statute of limitations begins to run." *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (per curiam). The tolling provision excludes from the limitations period only the time that the state relief application remained undecided, including the time during which an appeal from the denial of the motion was taken. *Saunders v. Senkowski*,

---

[5] Respondent contends that petitioner was actually aware of the information contained in Dunbar's statement before November of 2021, because those contents served as the basis of petitioner's third 440 motion filed in 2019. Dkt. No. 6 at 3. In that motion, a private investigator – who petitioner hired – submitted a sworn statement containing hearsay information that was provided to the investigator after he interviewed Dunbar on February 16, 2019. *Id.*; *see also* SCR at 200-211 (petitioner's third 440 motion); SCR at 239-240 (the private investigator's sworn statement; SCR at 416 (county court decision denying claim of a *Brady* violation because "[t]he affidavit of the investigator constitutes nothing but hearsay, devoid of any evidentiary value," and was "base . . . upon . . . what [the investigator] purports a witness [(Dunbar)] told him."). While the undersigned does not disagree with respondent's argument, it also appears that respondent has conceded that the alternate accrual date should be in November of 2021. Therefore, that is also the date the undersigned used for his calculations.

587 F.3d at 548; *Smith v. McGinnis*, 208 F.2d at 16.

Here, 147 days in the limitations period had passed between the date Petitioner's conviction

was final, when the new evidence was discovered in November of 2021, and the date the 440 action

was commenced.[6] Then, the limitations period would be tolled while Petitioner's fifth 440 motion

was pending between April 6, 2022, when it was received and stamped filed by the county court, and

August 10, 2022, when the Third Department denied Petitioner's application for leave to appeal.

Further, it appears Petitioner had 218 days left in the limitations period after the Third Department

issued its decision to timely file the instant action, or until March 16, 2023. However, the Petition

was not electronically filed with this Court until July 19, 2023, over four months beyond the

expiration of the limitations period. Consequently, it appears that statutory tolling does not save

Petitioner's claims from being deemed untimely.[7]

### ii. Equitable Tolling

Moreover, AEDPA's one-year statute of limitations period "is subject to equitable tolling in

appropriate cases." *Holland v. Florida*, 560 U.S. 631, 645 (2010). To warrant equitable tolling, a

petitioner must show "'(1) that he has been pursuing his rights diligently, and (2) that some

extraordinary circumstance stood in his way' and prevented timely filing." *Id.* at 649 (quoting *Pace

v. DiGuglielmo*, 544 U.S. 408, 418 (2005)); *Diaz v. Kelly*, 515 F.3d 149, 153 (2d Cir. 2008).

---

[6] Petitioner's 440 motion was counseled; accordingly, the prisoner mailbox rule did not apply. *See United States v. Terry*, 2022 WL 2954085, at *3 (E.D.N.Y. July 26, 2022) (discussing how the majority of circuits agree that the rationale supporting the prisoner mailbox rule, and its resulting protections, are not supported when a prisoner is represented by counsel) (citing cases); *Brockway v. Burge*, 710 F. Supp. 2d 314, 322 (W.D.N.Y. 2010) (declining to apply prisoner mailbox rule to a habeas petition when a prisoner was represented by counsel, instead deeming the petition's date of filing to be the date the pleading was received by the Clerk of the Court).

[7] This conclusion does not change if, instead, the prison mailbox rule applies to the 440 motion and it is deemed filed the day it is dated, on April 4, 2022.

*-10-*

Petitioner does not provide, nor does the record before the Court present, any circumstances which would support equitable tolling. Petitioner's fifth 440 motion was filed by the same counsel that currently represents him. *See* Dkt. No. 1-1, Danielle Neroni Affirmation ("Neroni Aff."), ¶¶ 1, 3, 5 (explaining that the attorney "was retained . . . for the purpose of submitting a . . . 440 . . . motion to Schenectady County Court," and subsequently "agreed to assist [petitioner] in this pursuit [of a federal habeas corpus petition] and . . . to assist in the filing of the applicable papers."). Accordingly, Petitioner had the benefit of counsel during the 218-day period when filing the instant federal habeas action would have been timely. However, the action was neither timely filed nor was there any reason provided why said filing was untimely or what extraordinary circumstances prevented the filing from occurring. As the Second Circuit has explained, "miscalculating a deadline is the sort of garden variety attorney error that cannot *on its own* rise to the level of extraordinary circumstances [that warrant equitable tolling.]" *Dillon v. Conway*, 642 F.3d 358, 364 (2d Cir. 2011) (citing *Holland v. Florida*, 560 U.S. 631, 651-52 (2010) & *Baldayaque v. United States*, 338 F.3d 145, 151-52 (2d Cir. 2003)) (emphasis in the original).

Therefore, equitable tolling does not save the untimely petition.

### iii. Equitable Exception

Courts have also recognized an equitable exception to the one-year statute of limitations under 28 U.S.C. §2244(d)(1) in cases where a petitioner can prove actual innocence. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). It is important to stress that "[o]nce guilt is . . . established . . . a federal habeas court will not relitigate the question of guilt for a state defendant who protests his actual innocence . . . [r]ather, a federal habeas court will review state convictions for constitutional error." *Hyman v. Brown*, 927 F.3d 639, 656 (2d Cir. 2019).

An actual innocence claim will be recognized only in a "narrow class of truly extraordinary cases [where a petitioner can] present[] credible and compelling claims of actual innocence." *Hyman v. Brown*, 927 F.3d at 656 (citing *Schlup v. Delo*, 513 U.S. at 315) (internal quotation marks omitted); *see also House v. Bell*, 547 U.S. 518, 538 (2006) (noting that the actual innocence gateway standard is "demanding and permits review only in the extraordinary case.") (internal quotation marks omitted). "The petitioner's burden in making a gateway showing of actual innocence is deliberately demanding." *Hyman v. Brown*, 927 F.3d at 656 (citing cases). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts or critical physical evidence–that was not presented at trial." *Schlup v. Delo*, 513 U.S. at 324; *see also Rivas v. Fischer*, 687 F.3d 514, 518 (2d Cir. 2012); *Whitley v. Senkowski*, 317 F.3d 223, 225 (2d Cir. 2003). In addition, "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. at 536-37 (quoting *Schlup v. Delo*, 513 U.S. at 327);[8] *see also Doe v. Menefee*, 391 F.3d 147, 160-62 (2d Cir. 2004).

"The standard's demand for evidence *of innocence* references factual innocence, not mere legal insufficiency." *Hyman v. Brown*, 927 F.3d at 657 (quoting *Schlup v. Delo*, 513 U.S. at 316 & *Bousley v. United States*, 523 U.S. 614, 623-24 (1998)) (internal quotation marks omitted). In clarifying what this standard requires, the Second Circuit explained:

---

[8] *Schlup* and *House* involved procedurally defaulted claims. *See McQuiggan v. Perkins*, 569 U.S. 383, 386 (2013). The Supreme Court in *McQuiggan* held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* and *House*, or, as in this case, the expiration of the statute of limitations." *Id.*

a reviewing court assessing the probability of actual innocence is not limited to the trial record. To the contrary, it "must consider all the evidence, old and new, incriminating and exculpatory," *House v. Bell*, 547 U.S. at 538 . . . (internal quotation marks omitted), and, in doing so, "is not bound by the rules of admissibility that would govern at trial," *Schlup v. Delo*, 513 U.S. at 327 . . . This is because, at the gateway stage of inquiry, a habeas court's task is not to identify trial error or to delineate the legal parameters of a possible new trial. It is to identify those cases in which a compelling showing of actual innocence would make it a manifest injustice to maintain conviction unless it was free of constitutional error. Thus, incriminating evidence obtained in the course of an unlawful search, or custodial admissions made in the absence of Miranda warnings, may well be inadmissible at trial. Nevertheless, such evidence is properly considered in assessing factual innocence, with the manner of procurement informing reliability and relevance and, therefore, weight.

*Id.* at 658.

Here, petitioner cannot satisfy this demanding standard. First, Petitioner must show that the evidence is newly discovered, so that it "could not with due diligence have been discovered before or during trial." *United States v. White*, 972 F.2d 16, 20 (2d Cir. 1992). Specifically, Petitioner must demonstrate that the information in Dunbar's November affidavit - that Dunbar "was being threatened with charges related to the homicide of Hassan Rainey . . . as well as the other felony charges [he] had pending against [him]," and that if Dunbar "agreed to testify against [Petitioner] . . . in exchange [he] would not be charged in Hassan Rainey's homicide, and . . . was able to plead to lesser charges in the [other pending felony charges]" – was unknown to him during his criminal trial. However, he cannot due so.

During Petitioner's criminal trial, the court heard arguments, outside the presence of the jury, regarding what agreement was made with Dunbar with respect to the various criminal activity Dunbar could have been charged with and what the scope and conditions of Dunbar's cooperation

with the prosecution was. SCR at 66-74. The contents of this conversation was known to Petitioner's attorney, and presumably, by extension, to Petitioner during the course of his trial. Further, the court transcript included the details of the discussion, which was provided to Petitioner and, presumably, used during his direct appeal.

Furthermore, during Petitioner's criminal defense attorney's cross-examination of Dunbar, she asked Dunbar whether, if he somehow lied or misrepresented something during the trial, he could "in fact be charged with respect to any incident occurring relating to the homicide [which served as the basis for Petitioner's criminal convictions.]" SCR at 74. Dunbar ultimately agreed with defense counsel that "[i]n addition to not being charged with [the homicide], . . . due to [Dunbar's] cooperation in [Petitioner's criminal] case [Dunbar] also received a break on two separate felony arrests that [he] had since th[e] homicide[.]" SCR at 76. Additionally, Petitioner's defense counsel followed up with a question which asked Dunbar if it was his understanding "of what [he] was told by the prosecutor[,] that if [Dunbar] wanted to avoid being charged with th[e] homicide [he] had to tell the truth," during his trial testimony. SCR at 80. While the prosecutor objected to the question, the judge allowed Dunbar to answer, which he did in the affirmative. *Id.* Accordingly, the issue of whether Dunbar was at risk of being prosecuted for Rainey's homicide if he did not provide truthful testimony, as well as the additional benefits Dunbar was receiving with respect to the other two pending felony matters, was an issue that was blatantly discussed, several times, during the criminal trial. Accordingly, it is not new information.

Further, Dunbar's statement does not establish that Petitioner is factually innocent of Rainey's homicide. Dunbar's statement repeats much of Dunbar's trial testimony, specifically reporting that he was sitting in the back seat of the van, along with Petitioner who was sitting in the

front passenger seat, and that when the vehicle pulled up along-side Rainey, shots were fired. *Compare* SCR at 31-46 (Dunbar direct trial testimony) *with* SCR at 668; *see also People v. Thompson*, 75 A.D.3d at 762-764 (referencing parts of Dunbar's trial testimony supporting Petitioner's conviction).   To the extent that Petitioner contends that Dunbar's statement is exculpatory because it now indicates that Dunbar only saw Brown fire the shots at Rainey's vehicle, SR at 668, such contentions are belied by the other information that was presented during the trial. Specifically, Petitioner's conviction remains supported by testimony from other witnesses that petitioner owned a .40 caliber gun and petitioner admitted to both the shooting and the destruction of the firearm, as well as evidence that Rainey was killed by a .40 caliber bullet and .40 caliber shell casings were recovered from the crime scene.  *See People v. Thompson*, 75 A.D.3d at 762-764.  In sum, Dunbar's statement does not prove that Petitioner is factually innocent.  Even if Dunbar said he did not or could not see Petitioner shooting, there was still ample evidence to indicate that Petitioner owned and possessed the gun that fired the bullets that killed Rainey and Petitioner actually fired the gun on the night in question.

Moreover, Petitioner's assumption that Dunbar's statement will result in some sort of impeachment evidence which can be used to discredit the testimony of the other witnesses is unavailing.  "Indeed, the Supreme Court has stated that newly discovered impeachment evidence is a step removed from evidence pertaining to the crime itself and tends only to impeach the credibility of the witness," instead of actually demonstrating actual innocence. *Jones v. Annucci*, 124 F. Supp. 3d 103, 124 (N.D.N.Y. 2015) (citing *Calderon v. Thompson*, 523 U.S. 538, 563 (1998)) (internal quotation marks omitted).  Thus, using Dunbar's statement to impeach the other witness testimony is insufficient to establish actual innocence.

*-15-*

Finally, there is no reason to believe that the content of Dunbar's statement would have changed the credibility determinations of the jury. Dunbar's credibility was already questioned by Petitioner's defense counsel, when she pointed out inconsistencies between Dunbar's grand jury testimony, indicating that Dunbar never saw Brown shoot at Rainey, and the trial testimony, which indicated that both Brown and Petitioner fired at Rainey's car. SCR at 80-83. It is unclear how a further inconsistent statement would be perceived; however, it is fair to say that the jury concluded that Petitioner's version of events was less credible than the prosecution's. Federal courts cannot disturb such credibility determinations for habeas relief. *See Love v. Martuscello*, 2022 WL 2109244, at *8 (W.D.N.Y. June 10, 2022)(denying petitioner's argument that the factfinder "should have weighed the credibility of the witnesses differently and drawn alternate inferences from the proof," because "[n]either [courts] on direct appeal nor . . . federal habeas . . . [are] permitted to revisit the factfinder's determinations as to the witnesses' credibility and veracity.") (internal quotation marks and citations omitted).

In conclusion, Petitioner has failed to establish an equitable exception that will save the Petition from being time-barred.

## V. CONCLUSION

**WHEREFORE**, it is

**RECOMMENDED** that the petition, Dkt. No. 1, be **DENIED and DISMISSED** in its entirety**;** and it is further

**RECOMMENDED** that no Certificate of Appealability ("COA") shall issue because petitioner has failed to make a "substantial showing of the denial of a constitutional right" as 28

U.S.C. § 2253(c)(2) requires;[9] and it is further

**RECOMMENDED** that any further request for a Certificate of Appealability must be addressed to the Court of Appeals (Fed. R. App. P. 22(b)); and it is further

**ORDERED** that the Clerk of the Court respectfully provide petitioner with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED** that the Clerk shall serve a copy of this Report-Recommendation and Order upon the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72 & 6(a).

**IT IS SO ORDERED.**

Dated: February 8, 2024
     Albany, New York

Daniel J. Stewart
U.S. Magistrate Judge

---

[9] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation" (emphasis in original)).